UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ x

DANIEL KIASHEK,　　　　　　　　　　　　　　Index No.

　　　　　　Plaintiff,

　　　　　　　　　　　　　　　　　　　　　　　　**COMPLAINT**

-against-　　　　　　　　　　　　　　　　　　**JURY TRIAL DEMANDED**

FIRST REPUBLIC BANK,

　　　　　　Defendant.
------------------------------------------------------------ x

　　　　Plaintiff, Daniel Kiashek, by his attorneys, Kaiser Saurborn & Mair, P.C., as and for his complaint against the defendant, alleges as follows:

## PARTIES AND VENUE

　　　　1.　　Plaintiff, Daniel Kiashek ("Kiashek"), was formerly employed by defendant in the position of Wealth Advisor in their New York office, located at 1230 Avenue of the Americas, New York, NY 10020.

　　　　2.　　Defendant, First Republic Bank ("First Republic"), is headquartered at 111 Pine Street, San Francisco, CA 94111.

　　　　3.　　First Republic maintains offices at 1230 Avenue of the Americas, New York, NY 10020.

　　　　4.　　This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because claims asserted herein arise under Sarbanes-Oxley [ 18 U.S.C. § 514 A.]

　　　　5.　　Venue is properly laid in this District pursuant to 28 U.S.C. § 1391 because it is a District in which the plaintiff worked for defendant, where plaintiff resides and where defendant maintains offices.

6. This is a whistleblower retaliation case brought under Sarbanes-Oxley, a sexual orientation discrimination case and a retaliation case brought pursuant to New York State Executive Law § 296 et seq. and New York City Administrative Code §§ 8-107, 8--502.

## BACKGROUND FACTS

**Mr. Kiashek's Employment**

7. On May 9th, 2016, Mr. Kiashek joined First Republic as a Wealth Advisor.

8. First Republic provides personal and business banking services as well as private wealth management services, including investment management services, brokerage services, and trust services.

9. Mr. Kiashek, at the time of his hiring at First Republic, had a long history of employment within the financial services industry, including a very successful career in banking at JPMorgan Chase where he built a large network of client relationships and professional contacts.

10. While at JPMorgan Chase, he was aggressively recruited by First Republic to join its company as a Wealth Advisor.

11. First Republic, as a financial institution trading in securities and providing wealth management services, is subject to regulatory requirements including but not limited to those under the oversight of the Securities Exchange Commission and the Financial Industry Regulatory Authority.

12. During his entire tenure of employment with First Republic, Mr. Kiashek performed his job responsibilities in superior fashion.

13. First Republic and Mr. Kiashek's superiors as well as First Republic's Human Resources Department and senior executives had a legal obligation to maintain a retaliation free

environment for whistle blowers as well as a discrimination and retaliation free environment for victims and complainants of employment discrimination.

14. Defendant's conduct has caused plaintiff substantial economic and emotional harm.

**Plaintiff's Sarbanes-Oxley Claims**

15. Soon after joining First Republic plaintiff began to experience troubling instances of improperly coded referrals, missing compensation metrics, and related compensation issues.

16. By way of example, plaintiff repeatedly notified the compensation team that his referrals, self-sourced mortgages and wealth management accounts, and related revenue was not being accurately captured in the Bank's system.

17. This system is critical because it is the exclusive platform by which plaintiff's goals and metrics as a Wealth Advisor are measured and corresponding bonuses or deficiencies calculated and logged.

18. Thus, the chronic issues with the Bank's failure to accurately record plaintiff's due compensation, extent of his account openings, referrals, and self-sourced business had a direct negative impact on his performance metrics.

19. Further, he was consistently forced to investigate these errors himself and seek corrections.

20. His requests for explanations clarification and correction often went without response from the appropriate departments.

21. This lack of transparency, diligence, and accuracy in recordkeeping and reporting also raised plaintiff's concerns regarding the Bank's regulatory compliance.

22. On or about June 20, 2016, Mr. Kiashek scheduled a monthly one-on-one meeting

with Bill Dessoffy ("Dessoffy"), the Bank's New York Regional Managing Director, to whom all Relationship Managers report.

23. The purpose of the meeting was to demonstrate to Mr. Dessoffy how eager and able Mr. Kiashek was to partner with him when his clients and prospects seek or require Wealth Management, Financial Planning or Life Insurance options.

24. Although Mr. Dessoffy regularly advised Mr. Kiashek that he would keep him in mind for referrals, of the 124MM of Wealth Management in 2017, 100% was attributed to Michael Keating, another Wealth Manager of the Bank, whether or not he was involved in the transaction.

25. Indeed, for numerous life insurance and wealth management meetings, Mr. Keating was not in attendance and yet was paid hundreds of thousands of dollars of commissions annually; all for work he never did for clients he never met.

26. This violated federal banking rules and regulations, as defined under FINRA and SEC requirements, and Mr. Kiashek complained repeatedly about this illegality.

27. Some of plaintiff's objections were memorialized in emails.

28. Rather than remedy the situation, First Republic simply invented a title for Mr. Keating to denote him as a supervisor to Mr. Kiashek and the other Private Wealth Advisors.

29. In other words, First Republic, aware of the issue, implemented a course of action to conceal the unlawfulness and permit it to continue.

30. Furthermore, in violation of its recordkeeping obligations, First Republic did not properly maintain records of employees' commissions and clients.

31. In fact, Mr. Kiashek had on more than one occasion notified First Republic that it was missing records of commissions to which he was entitled, thus causing Mr. Kiashek to be

underpaid.

32. Moreover, accounts for which Mr. Kiashek was responsible were misidentified as other employees' accounts.

33. This under reporting and misreporting of his commission entitlements was used to falsely accuse Mr. Kiashek of not meeting his obligations by using metrics that First Republic knew to be inaccurate and incomplete.

34. Another employee of the Bank was directed to "be good to Michael" and inferred that his initials must go on the paperwork on all accounts despite not being involved in any way.

35. This employee reported this to HR and informed them that this could be a FINRA/SEC violation.

36. The Bank's investigation into Mr. Kiashek's complaints of banking irregularities and illegal practices was a sham and falsely concluded there were no violations, without any basis and in spite of evidence to the contrary.

37. When Mr. Kiashek complained of these illegal practices and hired counsel, rather than properly investigating the complaints in good faith or seeking to remedy the problems, First Republic terminated Mr. Kiashek in retaliation for his complaints of the Bank's illegal practices.

38. The pretext for this termination was that it was premised upon ongoing performance issues.

39. These alleged performance issues were false and were never before raised to Mr. Kiashek.

40. The Bank's actions were clear pretext for retaliation against Mr. Kiashek for his complaints of violations of FINRA and SEC rules and regulations.

**The Employment Discrimination and Retaliation**

41.     Mr. Kiashek is an openly gay man.

42.     First Republic's recruitment efforts, when attempting to recruit plaintiff, stressed First Republic's collaborative environment and merit-based system for success.

43.     Plaintiff was particularly excited by the opportunity to work with a network of financial service professionals to generate results for his clients and for First Republic while providing a holistic package of wealth management services through a dynamic platform.

44.     In addition to his clear qualifications for his position, upon information and belief, the Bank sought to bring Mr. Kiashek into First Republic to gain the additional benefit of Mr. Kiashek's extensive book of portable business.

45.     As of Mr. Kiashek's official start date at the Bank of May 9, 2016, plaintiff brought approximately twenty-two (22) clients with him from JP Morgan to First Republic, representing approximately thirty-five (35) million dollars of portable business.

46.     These clients chose to move their accounts to First Republic to continue working with plaintiff.

47.     In addition to the terms as outlined in plaintiff's offer letter, the Bank offered the additional incentive of a lucrative referral structure providing for compensation bonuses.

48.     The Bank represented that its referral structure had certain institutional support, including merit based referrals between First Republic bankers and First Republic wealth management services.

49.     Plaintiff was also told that he would have the opportunity to work with more complex accounts, such as hedge funds and securities.

50.     Upon accepting the Bank's offer of employment, plaintiff was promised that he

would be given institutional resources to complete any necessary certifications.

51. Based on the Bank's representations, plaintiff accepted employment with Defendant expecting that all Wealth Advisors would have equal opportunity to work with banking-side professionals such as Relationship Managers and other First Republic professionals to develop contacts and exchange referrals.

52. Indeed, plaintiff rejected several other employment opportunities with similar financial firms and even more favorable financial terms in favor of working with First Republic.

53. Plaintiff's decision was largely predicated on the Bank's promise of managerial support and merit-based opportunities for professional growth.

54. As a Wealth Advisor, plaintiff worked in the private wealth management sector as one of four (4) Wealth Advisors in Respondent's New York region.

55. Wealth Advisors necessarily work closely with First Republic's banking professionals, called Relationship Managers, and rely heavily on referrals from Relationship Managers. As discussed herein, these referrals are essential to meet Respondent's performance metrics.

56. Plaintiff's starting salary with the Bank was $175,000.00 with a $25,000 signing bonus.

57. Plaintiff's initial 2016 Wealth Advisor Incentive Plan's five key components are: 1) bank referred wealth management referral fees; 2) non-bank referred wealth management 3) bank product referral fees; 4) special incentive programs for 2016; and 5) target incentive programs.

58. A critical component of bank referrals is the requirement that each respective

wealth advisor be "materially involved" in the referral.

59. Material involvement requires meeting with the prospective client at least once and submitting supporting documentation.

60. Pursuant to plaintiff's 2016 incentive plan, he had a target annualized revenue generation of $400,000.00 for fiscal year 2017.

61. The Bank's business model relies on both "self-sourced" clients, those that each individual wealth advisor brings into the company through existing contacts or outside referrals, as well as referrals among and between First Republic employees working in respective departments.

62. Thus, cooperative relationships between Wealth Advisors and Relationship Managers are essential for a Wealth Advisor to succeed at First Republic and meet employment goals. Performance goals simply cannot be met without receiving referrals from Respondent's banking professionals.

63. Understanding the importance of developing his professional relationships, plaintiff immediately endeavored to work with Relationship Managers and other First Republic professionals in service of his clients, his professional success and the Bank's success.

64. These efforts were well-received by banking professionals and upper management, and plaintiff immediately began referring his clients to banking-side professionals and issued these referrals to banking professionals with the expertise best suited to the needs of his clients.

65. Despite issues with inaccurate revenue records, from May 2016 through December 2016, the first seven months of plaintiff's employment generated approximately $324,000.00 of business.

66. This business was generated without reference to performance metrics because plaintiff did not have a revenue target for this time-period.

67. Plaintiff's initial revenue target, as outlined in his 2016 incentive terms, was $400,000.00 for fiscal year 2017.

68. Given his good performance, despite obstacles, plaintiff was surprised to receive a year-end performance review with a "needs improvement" rating.

69. Plaintiff was further surprised by this review because he had received only positive feedback from his colleagues and supervisors and had not been made aware of any concerns with his performance.

70. Plaintiff immediately sought to address this review by contacting his supervisors, Robert Thornton ("Thornton"), and Vice President Nicolas Gentin ("Gentin"), to request a meeting to discuss his performance review.

71. At this time, plaintiff had also become concerned with the veracity of the Bank's claim that referrals were based on merit.

72. Plaintiff immediately noticed that he was not receiving reciprocal referrals from banking professionals, despite his efforts to provide these individuals with referrals and to cultivate working relationships.

73. For example, plaintiff consistently attempted to work with Mr. Dessoffy.

74. Mr. Dessoffy was aware of plaintiff's sexual orientation and repeatedly referenced his identity as a gay man.

75. The emphasis on his sexuality made plaintiff very uncomfortable and increasingly concerned that his sexual orientation was the basis for his lack of client referrals.

76. By way of example, during one working lunch with Mr. Dessoffy, plaintiff

attempted, as he often did, to discuss potential client referrals.

77. Each client that plaintiff brought up was dismissed by Mr. Dessoffy, stating that plaintiff was "not a good fit" for particular clients or particular "types" of clients.

78. When plaintiff asked Mr. Dessoffy what "types" of clients he thought plaintiff would be a good fit for, Mr. Dessoffy stated that he would be a good fit for "theater clients."

79. Plaintiff plainly understood this comment to be in direct reference to his sexual orientation, given the stereotypical understanding of the theater industry as an LGBT industry.

80. Plaintiff was highly offended by this and feared that this attitude threatened his referral business and the business working with existing clients.

81. It seemed clear that Mr. Dessoffy's suggestion stemmed from the assumption that straight clients would not want to work with an openly gay Wealth Advisor and that plaintiff should instead work exclusively with clients in stereotypically LGBTQ industries.

82. Exclusion from client-generating systems because of the Bank's biases threatened plaintiff's existing and future business.

83. Plaintiff has a long history of working with a diverse client-base, many of whom followed him to First Republic.

84. While plaintiff found his interaction with Mr. Dessoffy troubling and offensive, he reiterated to Mr. Dessoffy his openness to all referrals and further emphasized the extent and diversity of his client base in hopes of receiving referrals matching his advising style, experience, and expertise - not his sexual orientation.

85. Plaintiff's experiences were further informed by the experiences of his colleagues who confided in him that First Republic has a longstanding problem with

discriminatory biases, both implicit and explicit, influencing referrals and employment opportunities.

86. Upon information and belief, the Bank has long been on notice of discrimination influencing referrals.

87. For example, a number of plaintiff's colleagues in the private wealth management groups stated to him that banking referrals were not given to female wealth advisors.

88. Indeed, plaintiff repeatedly observed this issue in practice wherein highly capable female wealth advisors were passed over for referrals in favor of straight male wealth advisors.

89. In short, the highest-earning individuals and those that received the vast majority of referrals were heterosexual white males.

90. With only four Wealth Advisors, it was clear to see through revenue reports and account summaries that Michael Keating, one of plaintiff's straight counter-parts in Wealth Advising, was receiving approximately ninety percent (90%) of referral business.

91. Plaintiff further confirmed through review of year-end reports that Mr. Dessoffy referred all of his accounts to Keating, representing over one hundred and twenty (120) million dollars of referral business given exclusively to Keating.

92. Upon information and belief, Mr. Dessoffy, himself the subject of many prior complaints of harassment and discrimination, expressly told banking professionals that all referrals must be given to Mr. Keating.

93. Thus, while Mr. Keating, a straight white male, received a windfall through this exclusive referral scheme, the other three wealth advisors, plaintiff, a gay man, a

female advisor, and a substantially older male advisor-were left without adequate referral revenue to meet target goals.

94. The referrals plaintiff did receive were through other minority professionals who, at the risk of their own professional success, ignored Mr. Dessoffy's discriminatory directive.

95. Often times, upon information and belief, these referrals were given to Mr. Keating contrary to the preference of the referring banker and contrary to client preferences.

96. With the encouragement and cooperation of several female Relationship Managers and Wealth Advisors, plaintiff first raised these issues in or around April 2017 through email correspondence to Gentin, wherein plaintiff complained of Respondent's culture of discrimination and discriminatory treatment of himself as a gay man and his female colleagues.

97. Instead of attempting to investigate or remedy the allegations in plaintiff's discrimination complaint, the Bank ignored plaintiff's attempts to address the underlying issues and instead offered a blanket denial of his complaint without undertaking an investigation.

98. Instead of receiving an investigation or any disciplinary or remedial corrections, Keating was given a promotion and made to be plaintiff's direct supervisor.

99. Keating and plaintiff had previously held the same position and this promotion was intended to punish and intimidate plaintiff for daring to complain of discriminatory referrals.

100. This conduct continued to worsen following plaintiff's April 2017 complaint, requesting a confidential investigation and providing detailed accounts of the discriminatory treatment he suffered.

101. Plaintiff further provided Human Resources with a number of fellow employees willing to corroborate his allegations.

102. Plaintiff's complaint was instead assigned to Cindy Telford, a human resources representative in the Bank's San Francisco HQ office, who concededly does not work with Relationship Managers or Wealth Advisors. As such, Telford was unable to understand the referral structures of those business lines and the extent of harm to plaintiff's business, ability to perform his job, and reputation that discriminatory referrals present.

103. Further, plaintiff's complaint was not investigated in a thorough or impartial manner and was not kept confidential in violation of Respondent's policies.

104. Plaintiff engaged in two telephone calls to discuss his complaint and the Bank's purported findings.

105. The first of these telephone calls was with Cindy Telford, the Human Resources representative formally tasked with investigating his complaint, on or about June 29, 2018. In this phone call, Ms. Telford stated that her official conclusion was that her investigation did not result in a finding of discriminatory treatment.

106. Plaintiff emphasized in this phone call issues that he had previously brought to her attention and to the attention of other Human Resources representatives.

107. Specifically, individuals plaintiff identified as having corroborating information and experiences had not in fact been spoken to during the course of the Bank's investigation.

108. Plaintiff further reiterated his concern that his allegations and the nature of his complaint had not been kept confidential, as Respondent's policy dictates, but instead was immediately discussed with Dessoffy and Keating, the very individuals at the heart of his discrimination complaint.

109. Indeed, plaintiff's colleagues were expressly told not to cooperate with HR's investigation lest they face reprisal.

110. Further, several individuals told plaintiff that Dessoffy and Keating had full knowledge of his allegations, learned of his complaint from HR and expressly prohibited these individuals from confirming the veracity of my allegations.

111. Ms. Telford further dismissed the report plaintiff submitted in support of his complaint showing approximately ninety percent (90%) of all banking referrals are given to Keating.

112. While Telford could not deny the fact of those referral numbers, and indeed acknowledged that "a large portion of referrals" were routed to Mr. Keating, Ms. Telford repeatedly stated that relationship managers are free to refer business to whichever wealth advisor they see fit.

113. Ms. Telford repeatedly stated that relationship managers refer business to those wealth advisors that they "trust," "feel comfortable with," and "who they feel their clients will want to work with."

114. That explanation only further highlights the extent to which implicit bias permeates The Bank's incentive structure. By giving individual employees unfettered discretion in referrals, even at the expense of the client's goals and wishes, discriminatory practices can flourish under the auspice of "trust."

115. Ms. Telford further confirmed that she had been told by some employees that relationship managers are expressly directed not to refer business to certain wealth advisors and overtly pressured to refer clients to Keating.

116. After plaintiff issued his discrimination complaint, Dessoffy and Keating began discussing the investigation openly and pressuring their subordinates not to speak with HR, implicitly threaten in the risk of retaliation and other reprisals.

**Plaintiff is Terminated in Retaliation for
His Whistleblower Complaint and Discrimination
Complaints and Because he is a Gay Man**

117. Approximately three (3) weeks after plaintiff's discussion with Ms. Telford, Mr. Gentin asked to have a videoconference with him.

118. During this meeting, on or about July 19. 2018, Gentin offered plaintiff a lump sum severance amount in exchange for his termination.

119. Plaintiff expressed his desire to continue my work with First Republic and reiterated that his complaints were solely related to the discriminatory treatment he suffered.

120. Plaintiff stated clearly that he intended to remain at First Republic and perform his job duties unfettered by discriminatory barriers to success.

121. Mr. Gentin responded that First Republic "welcomed and encouraged" him to stay on and the company's intention to "move forward" and facilitate his success with the company. Mr. Gentin also referenced at this time the success of plaintiff's past performance.

122. Plaintiff thereafter retained counsel on or about July 26th 2018 to advise him concerning his employment concerns and soon thereafter notified the Bank.

123. Soon after communicating that he had retained counsel, plaintiff received voicemail messages from Mr. Gentin asking plaintiff to call him to discuss an "urgent matter."

124. Mr. Gentin thereafter terminated plaintiff, effective immediately, on Sunday, August 5, 2018.

125. In this conversation, Mr. Gentin referenced that plaintiff retained counsel to continue to seek redress for the Bank's conduct and stated that plaintiff would be placed on immediate administrative leave "as a courtesy" to plaintiff and his counsel.

126. Plaintiff complained to Mr. Gentin that his termination was issued in retaliation for his complaints of discrimination and whistleblowing and his protected activity of retaining counsel.

127. Mr. Gentin responded that plaintiff's termination was based off of "performance issues" without specifying what the alleged performance issues were, nor why he had suddenly had a change of heart concerning plaintiff's employment after he learned that plaintiff was continuing to pursue his discrimination claims.

128. The stated reason for plaintiff's termination was a pretext for the Bank's retaliatory and discriminatory motives for terminating plaintiff's employment.

129. As a consequence of the Bank's illegal actions, plaintiff has suffered loss of back pay and front pay, emotional injuries and attorney fees. Defendant's knowing intentional acts of discrimination and retaliation in violation of State and City law justifies a punitive award against the Bank as well.

**WHEREFORE,** plaintiff hereby demands the following:

### FIRST CAUSE OF ACTION

130. Pursuant to Fed. R. Civ. P. 10(c), plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "129" as if repeated and incorporated herein.

131. Defendant's conduct set forth in this Complaint violates Sarbanes-Oxley Acts, 18 U.S.C. § 514 A.

132. By reason of the foregoing, Mr. Kiashek has suffered damages, including lost front and back pay, lost benefits and emotional injuries.

## SECOND CAUSE OF ACTION

133. Pursuant to Fed. R. Civ. P. 10(c), plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "129" and "131" as if repeated and incorporated herein.

134. Defendant discriminated against plaintiff due to his sexual orientation and retaliated against plaintiff for complaining of said discrimination in violation of New York State Executive Law §296, et seq.

135. By reason of the foregoing, Mr. Kiashek has suffered damages, including lost front and back pay, lost benefits, emotional injuries and, due to defendant's intentional and/or malicious conduct, punitive damages.

## THIRD CAUSE OF ACTION

136. Pursuant to Fed. R. Civ. P. 10(c), plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "129", "131" and "134" as if repeated and incorporated herein.

137. Defendant discriminated against plaintiff due to his sexual orientation and retaliated against plaintiff for complaining of said discrimination in violation of New York City Administrative Code §§8-107, 8-502.

138. By reason of the foregoing, Mr. Kiashek has suffered damages, including lost front and back pay, lost benefits, emotional injuries, attorney fees and, due to defendant's intentional and/or malicious conduct, punitive damages.

**WHEREFORE**, plaintiff hereby demands judgment against defendant as follows:

(i) On the first cause of action, assessing compensatory damages including lost past and future earnings, lost benefits and emotional injuries

  (ii) On the second cause of action, assessing compensatory damages including lost past and future earnings, lost benefits and emotional injuries;

  (iii) On the third cause of action, assessing compensatory damages including lost past and future earnings, lost benefits, emotional injuries, attorney fees and punitive damages; and

  (iv) For such further relief as the Court deems just and proper.

Dated: New York, New York
   May 16, 2019

            **KAISER SAURBORN & MAIR, P.C.**

By: _____
            Daniel J. Kaiser [DK-9387]
            William H. Kaiser [WK-7106]
            Kaiser Saurborn & Mair, P.C.
            ATTORNEYS FOR PLAINTIFF
            30 Broad Street, 37th Floor
            New York, New York 10004
            (212) 338-9100